WILLIAM T. GRANT, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 5143-65. Filed July 31, 1967.

*A. Chauncey Newlin* and *David Sachs*, for the petitioner.
*Charles M. Costenbader*, for the respondent.

SCOTT, *Judge:* Respondent determined deficiencies in petitioner's gift taxes for the years 1960, 1961, 1962, 1963, and 1964 in the amounts of $329,608.67, $246,799.84, $240,107.54, $210,318.07, and $125,157.69, respectively.

The issue for decision is whether the provision in certain trusts to which petitioner made gifts of life estates to named individuals with the remainder interest to go to a charity that dividends paid in stock of the declaring corporation of a value not exceeding 5 percent of the value of the shares on which the dividend is declared shall be income, creates such a possibility of diversion of trust principal that the allowable deduction for the charitable remainder interests should be computed by applying the appropriate actuarial factors contained in respondent's Gift Tax Regulations to the fair market value of the stock on the respective dates of transfer less the per-share amount of accumulated earnings and profits of the corporation on such dates instead of to the entire fair market value of the stock on the dates of the transfers.

### FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly. The stipulated facts include as exhibits numerous documents. Since these documents are incorporated herein by finding the facts as stipulated, only such portions or provisions of these documents as are necessary to an understanding of the issue in this case will be set forth herein.

Petitioner, an individual whose legal residence at the time of the filing of the petition in this case was Greenwich, Conn., filed timely Federal gift tax returns for each of the calendar years 1956 through 1964 with the district director of internal revenue, Hartford, Conn., and timely paid the gift taxes shown to be due on such returns.

At various times during the years 1956, 1957, 1958, and 1960 through 1964, petitioner transferred shares of common stock of W. T. Grant Co. to irrevocable trusts for the benefit of various individuals other than himself as life tenants and the Grant Foundation, Inc. (hereinafter sometimes referred to as the foundation), as the remainder-

man. The foundation is a charitable organization to which gifts are deductible under section 2522(a), I.R.C. 1954.[1]

Petitioner's purpose in making each of the transfers in trust was to provide life incomes for relatives, employees, and friends, and to transfer the principal assets outright to the foundation upon the deaths of the respective income beneficiaries.

In each of these trusts the Connecticut Bank & Trust Co. (hereinafter referred to as the Connecticut Bank) was appointed trustee, and in each of the trusts, except the two created on May 8, 1956, and June 18, 1956, Albert E. Kelly (hereinafter referred to as Kelly) was appointed a cotrustee.

Kelly was not related to petitioner but was employed on a full-time basis as petitioner's personal financial adviser from September 1951 through 1964 at a salary between $21,875 and $24,500 per annum, and in addition acted as an independent financial consultant to W. T. Grant Co. for consulting fees which ranged during the years 1956 through 1964 between $2,500 and $5,000 per year.

The sole trustee of the trusts created on May 8, 1956, and June 18, 1956, was the Connecticut Bank.

With the exception of the trust created on June 22, 1961, which named as the life beneficiary Beth Bradshaw, each trust agreement with respect to gifts in trust for a life beneficiary or beneficiaries and the charitable remainder to the foundation, executed by petitioner during the years 1956 through 1962, provided in part as follows:

FOURTH: The Trustees shall have the following powers and discretions, in addition to any conferred by law:

1. To retain the securities transferred hereunder and any additional securities or property which may be added to the trust, without liability for any decrease in value.

2. To sell or exchange any property comprising the trust fund and the Income Reserve Fund and, without being restricted to property authorized by the laws of the State of Connecticut or of any other jurisdiction for trust investment, to invest said funds in any kind of property whatsoever, real or personal, whether or not productive of income, and without regard to the proportion that such property, or property of a similar character held, may bear to the entire trust fund; provided, however, that no sale, exchange, pledge or other disposition of any stock or securities of W. T. GRANT COMPANY, or its successor, at any time held by the Trustees shall be made without the written consent of at least two-thirds of the authorized number of Trustees of the GRANT FOUNDATION (INCORPORATED). The Trustees may invest the Income Reserve Fund, in whole or in part, in shares of any Common Trust Fund maintained by the Corporate Trustee.

The Trustees hereunder shall be under no obligation or duty to inquire into the business or affairs of said W. T. Grant Company or its successor, or to

---

[1] All references are to the Internal Revenue Code of 1954.

inquire into the advisability of holding or disposing of any of the stock or securities of said company or its successor.

3. To vote in person or by proxy, or to refrain from voting, upon securities held by it, and in such connection to delegate their discretionary powers.

4. To exercise options, conversion privileges or rights to subscribe for additional securities and to make payments therefor.

5. To consent to or participate in dissolutions, reorganizations, consolidations, mergers, sales, leases, mortgages, transfers or other changes affecting securities held by them and in such connection to delegate their discretionary powers and to pay assessments, subscriptions and other charges.

6. To retain any property acquired in connection with the foregoing provisions, whether or not such property shall be authorized by the laws of the State of Connecticut or any other jurisdiction for trust investment.

7. To register any property in the name of their nominee or in their own names or to hold said property unregistered or in such other form that title shall pass by delivery, but without thereby increasing or decreasing their liability as Trustees.

FIFTH: No person or corporation dealing with the Trustees shall be required to investigate the Trustees' authority for entering into any transaction or to see to the application of the proceeds of any transaction.

SIXTH: If securities are purchased or received at a premium or at a price in excess of the call or redemption price or the amount payable at maturity or on liquidation the Trustees may, in their discretion, but shall not be required to, use any part of the income from such securities to amortize or restore to principal such premium or excess.

Dividends and distributions received by the Trustees shall be treated as follows:

1. All dividends paid in cash, whether ordinary or extraordinary and including dividends of wasting asset corporations and capital gains distributions of regulated investment companies, shall be income.

2. Every dividend paid in stock of the declaring corporation, of the same class as the stock on which the dividend is declared, which is in an amount not exceeding 5% of the shares on which the dividend is declared, and every dividend paid in stock of the declaring corporation, of a class different from the class on which the dividend is declared, which has a fair market value on the date of payment not exceeding 5% of the fair market value on such date of the stock on which the dividend is declared, shall be income.

3. Every other dividend or distribution paid by a corporation in shares of its own stock shall be principal.

4. All dividends paid in property of the declaring corporation (including stock or other securities of any other corporation) or in its bonds, to the extent that they represent or are charged against earnings of the declaring corporation, regardless of when earned, shall be income.

5. Notwithstanding the foregoing, any distribution made by a corporation in whole or partial liquidation, or representing a substantial part of its total assets, shall be principal.

The Trustees shall have discretion to resolve any questions of fact or of law arising in connection with the application of the foregoing, and as to the allocation of any property between principal and income as to which no express provision is made in this Agreement, and their decision shall be binding upon all interested parties.

Dividends declared but upaid on securities transferred by the Donor to the Trustees, and having a record date subsequent to the date of this Agreement, shall belong to the trust and shall be income.

SEVENTH : The donor reserves the right to remove, without cause, any Trustee at any time acting hereunder, by instrument in writing delivered to such Trustee. After the death of the Donor the Trustees of The Grant Foundation (Incorporated), by vote of a majority of the authorized number of such Trustees, are authorized to remove any individual or corporate Trustee in like manner.

Any Trustee at any time acting hereunder may resign by written notice to the Donor, given by registered mail or delivered personally, and after the death of the Donor, by such notice given to the co-Trustee then acting and to The Grant Foundation (Incorporated).

In the event of the removal, death or resignation of any Trustee, either during the lifetime of the Donor or after his death, the Trustees of The Grant Foundation (Incorporated), by vote of a majority of the authorized number of such Trustees, are authorized to appoint a successor Trustee, who may not be the Donor, by instrument in writing delivered to such successor.

Any successor Trustee appointed as herein provided upon executing an acknowledged acceptance of the trusteeship shall be vested without further act on the part of any one with all the estates, rights, titles, powers, duties, immunities and discretions herein granted to the Trustees named.

Any Trustee who resigns or is removed shall be entitled to reimbursement from the trust fund for all expenses incurred by such Trustee in connection with the settlement of his accounts and the transfer and delivery of the trust assets to a successor.

EIGHTH : In the event of a disagreement between the corporate Trustee and the individual Trustee in respect to the exercise of any power or discretion conferred upon the Trustees under the provisions of this Agreement, the decision of the individual Trustee shall control.

The trust agreements were drafted by petitioner's counsel and the provisions of subparagraphs 2 and 3 of paragraph SIXTH of the agreements were placed in the trust agreements in accordance with the custom of the law firm of which petitioner's counsel was a member to make specific provision with respect to the allocation between income beneficiaries and remaindermen of dividends paid in stock of the issuing corporation in all trust agreements which they prepared. When the trust agreements were given to petitioner for him to read and execute, his counsel did not specifically discuss these provisions with him.

The trust agreement of June 22, 1961, under which Beth Bradshaw was the life beneficiary and the foundation was the remainderman, contained the following paragraph with respect to dividends paid by the corporation in its own stock:

SIXTH : Premiums on securities purchased by the Trustees shall be amortized.

Every dividend paid by a corporation in its own stock received by the Trustees, shall be principal.

Dividends declared but unpaid on securities transferred by the Donor to the Trustees, and having a record date subsequent to the date of this Agreement, shall belong to the trust and shall be income.

On January 3, 1963, and January 2, 1964, petitioner created two trusts with individual life beneficiaries and the remainder to the foundation which contained the following provision with respect to dividends paid in stock of the issuing corporation:

All ordinary dividends paid in cash shall be income, but any distributions made by a corporation in whole or partial liquidation, or representing a substantial part of its total assets, and capital gains distributions of regulated investment companies, shall be principal.

Every dividend paid in the stock of the declaring corporation shall be principal, except that any dividend paid in stock of the declaring corporation, of the same class as the stock on which the dividend is declared, which is in an amount not exceeding 5% of the shares on which the dividend is declared, and any dividend paid in stock of the declaring corporation, of a class different from the class on which the dividend is declared, which has a fair market value on the date of payment not exceeding 5% of the fair market value on such date of the stock on which the dividend is declared, and which stock dividends are paid wholly out of earnings of the corporation for the year in which declared, shall be income.

On January 3, 1963, and January 2, 1964, petitioner transferred additional stock of W. T. Grant Co. to a number of the various trusts he had created between September 23, 1958, and February 1, 1961, the certificates for which were transmitted to the trustee with a letter which stated in part as follows:

The shares delivered to you herewith are to be held and administered, as segregated parts of said trusts, subject to all of the terms of the respective trust agreements, except that the provisions of the trust agreements that certain stock dividends, extraordinary cash dividends, and capital gains distributions of regulated investment companies, shall be income, shall not apply to the segregated parts constituting the additions hereby made to the trusts. The provisions in the trust agreements that such distributions shall be income were included in the trust agreements anticipating that any distributions made in accordance therewith in fact would be made out of current corporate earnings, and the allocation of such amounts to trust income would not result in a dilution of trust principal any more than if such provisions had not been included in the trust agreements.

The life beneficiaries of six of the trusts created by petitioner, two created on September 23, 1958, three on February 29, 1960, and one on January 3, 1963, had died at the time of the trial of this case and the trust principal of each of these six trusts consisting of the full number of shares of common stock of W. T. Grant Co. transferred by petitioner at the time the trust was created or by subsequent additions including any shares received as a result of a stock split in May 1960, had been paid over to the foundation in accordance with the terms of the trust agreements. The aggregate fair market value of the shares transferred to these six trusts as of the date such shares were transferred by petitioner to the trusts was $428,060, and the aggregate fair market value of these shares when transferred to the foundation on the deaths of the life beneficiaries was $476,386.

W. T. Grant Co. is a Delaware corporation, incorporated in 1937, which is engaged in the business of operating a chain of general merchandise stores. This corporation is a successor to a Delaware corporation of the same name incorporated in 1927 which was the successor of a Massachusetts corporation of the same name incorporated in 1906. The Massachusetts corporation was organized by petitioner and three other unrelated individuals, each of whom owned a one-fourth interest. The first store operated by this corporation was opened on December 6, 1906, at Lynn, Massachusetts. Subsequent to the organization of the Massachusetts corporation and prior to 1923, petitioner purchased the common stock of the other three organizers of the Massachusetts corporation so that by 1923 he or trusts created by him owned all of the common stock of that company. After 1923 shares of common stock of the original W. T. Grant Co. or its Delaware successor were sold to the public and in 1928 the common stock of the first Delaware corporation was listed on the New York Stock Exchange.

No stock dividend has ever been paid by W. T. Grant Co., the Delaware corporation incorporated in 1937, and as of the date of the trial of this case that company had no present plans to declare any stock dividend.

The only stock dividend declared by either of the predecessors of the present W. T. Grant Co. was in 1923 when, by the mechanics of a stock dividend, the common stock was split 10 for 1, and in 1929 when the common stock was doubled by a 100-percent stock dividend. Immediately following the stock dividend of 10 for 1, the then outstanding common stock was split 3⅓ for 1.

On September 18, 1945, the common stock of W. T. Grant Co. was split 2 for 1, and the par value per share was reduced from $10 to $5, and on May 13, 1960, the common stock of W. T. Grant Co. was split 2 for 1 and the par value per share was reduced from $5 to $2.50. On May 13, 1966, the common stock of W. T. Grant Co. was split 2 for 1, and the par value per share was reduced from $2.50 to $1.25.

Cash dividends have been paid by W. T. Grant Co. and its predecessor corporations on its common stock every year since 1907 and through the years the annual dividends have been increased steadily to the point where in 1966 such dividends were approximately 27½ times the dividends in 1907.

During the period 1956 through 1966 petitioner was chairman of the board of directors of W. T. Grant Co. In June of 1966 petitioner had become 90 years old. He was made honorary chairman of the board, and Edward Staley was made chairman. The board of directors of the W. T. Grant Co. consisted of 14 members from 1956 until February 1964 when it was increased to 18 members. No member of the board of directors and no executive officer of W. T. Grant Co. ever in office

has been a relative of petitioner. Until 1953 petitioner was actively engaged in the management of the affairs of W. T. Grant Co. although for several years prior to 1953 he had not been involved in the day-to-day administration of the affairs of the company. From 1953 until 1959 petitioner was kept informed of the activities, policies, and procedures of the W. T. Grant Co. but took no active part in formulating such policies or procedures. In 1953 petitioner was 77 years old and suffered a stroke in that year.

In September 1959 Edward Staley became vice chairman of the board of directors of W. T. Grant Co. and since that time petitioner has not participated in the managing and directing of W. T. Grant Co. He has not attended any directors or stockholders meetings or visited the executive offices of the company since 1959. Since 1959 he has attended about four courtesy luncheons with officers of W. T. Grant Co. Petitioner has not received or been paid an officer's salary by W. T. Grant Co. since 1932.

In 1958 petitioner owned outright 2½ percent of the outstanding shares of the common stock of W. T. Grant Co. and in 1965 owned outright 1 percent of such shares. In 1965 petitioner was cotrustee of a trust holding 2½ percent of the outstanding shares of common stock of W. T. Grant Co. and 4.2 percent of such stock was in trusts over which petitioner had a power of revocation. In 1959 the total of the amount of common stock held outright by petitioner or by trusts of which he was a trustee or trusts over which he had a power of revocation was 19.2 percent. The following schedule shows the total number of shares of common stock issued and outstanding as of January 31 of the years indicated, the number of stockholders of record as of such date, the number of shares of common stock of W. T. Grant Co. beneficially owned by petitioner as of March of each such year, the number of shares owned by the foundation as of March of each year, and the largest number of shares owned by the third largest shareholder on the quarterly dividend record date:

| Year | Number of shares outstanding, January 31 | Number of stockholders of record, January 31 | Number of shares beneficially owned by petitioner as of March | Number of shares owned by the Grant Foundation as of March | Largest number of shares owned by third largest shareholder on a quarterly dividend record book |
|---|---|---|---|---|---|
| 1956 | 2,463,533 ($5 par) | 5,929 | 647,812 (26%) | 290,216 (12%) | 101,424 |
| 1957 | 2,482,943 ($5 par) | 6,018 | 634,012 (25.6%) | 290,216 (11.7%) | 127,330 |
| 1958 | 2,498,268 ($5 par) | 6,991 | 586,412 (23.6%) | 290,216 (11.7%) | 161,317 |
| 1959 | 2,514,823 ($5 par) | 7,742 | 573,412 (23%) | 290,216 (12%) | 191,712 |
| 1960 | 2,858,493 ($5 par) | 11,634 | 524,912 (18%) | 290,216 (10%) | 330,575 |
| 1961 | 5,789,126 ($2.50 par) | 12,914 | 954,824 (16.5%) | 616,768 (10.8%) | 379,480 |
| 1962 | 5,846,111 ($2.50 par) | 13,854 | 874,724 (14.9%) | 616,768 (10.5%) | 363,030 |
| 1963 | 5,890,151 ($2.50 par) | 15,902 | 821,724 (14%) | 634,462 (10.8%) | 349,470 |
| 1964 | 5,941,081 ($2.50 par) | 16,480 | 815,524 (13.8%) | 642,162 (10.8%) | 362,390 |
| 1965 | 6,014,681 ($2.50 par) | 15,771 | 842,624 (14.1%) | 647,162 (10.8%) | 669,843 |

614

As of March of each of the years 1958 through 1964, the total number of shares of common stock of W. T. Grant held in trust by the Connecticut Bank and Kelly was 107,500, 123,500, 163,500, 419,000, 517,200, 571,970, and 592,070, respectively. For the years 1958, 1959, and 1960, the shares so held had a par value of $5 per share, and for the remaining 4 years they had a par value of $2.50 per share.

On December 14, 1942, petitioner transferred a total of 146,833 shares of common stock ($10 par value) of W. T. Grant Co. to the Connecticut Bank and Howland S. Davis as trustees of 14 trusts created by agreements of that date under which the life beneficiaries were various individuals and the remainderman was the foundation. Each of these trust agreements provided that the donor reserved the right to remove the corporate trustee at any time without cause, that after the death of the donor, the trustees of the foundation were authorized to remove any individual or corporate trustee, that in the event of the death or resignation of any individual or corporate trustee during the lifetime of the donor, the donor may appoint a successor trustee, and that in the event of the death, resignation, or removal of such a trustee after the death of the donor, the trustees of the foundation were authorized to appoint a successor trustee. The trust instruments also provided that in the event of a disagreement between the corporate trustee and the individual trustee in respect to the exercise of any power or discretion conferred upon the trustees, the decision of the individual trustee shall control.

Howland S. Davis was a director of W. T. Grant Co. from 1924 and was a business associate of petitioner prior to 1924. Other than petitioner, Howland S. Davis had the longest period of continuous service on the board of directors of W. T. Grant Co., and he was also a trustee of the foundation from 1938 until 1964.

As of March of each of the years 1956 through 1965, the total number of shares of common stock of W. T. Grant held in the trusts created by petitioner on December 14, 1942, of which the Connecticut Bank and Howland S. Davis were trustees, were 253,334 shares ($5 par value) for each of the years 1956 through 1960, 506,668 shares ($2.50 par value) for the years 1961 and 1962, and 492,004 shares ($2.50 par value) for the years 1963, 1964, and 1965.

As of 1963 certain of the trusts created on December 14, 1942, terminated by reason of the death of the individual life beneficiary and the shares of common stock of the W. T. Grant Co. held by those trusts at the time of termination were transferred to the foundation in accordance with the terms of the trust agreements.

Between 90 and 91 percent of the outstanding common stock of W. T. Grant Co. is voted at each annual meeting. The common stock does not have cumulative voting rights. As of the date of the trial of

this case approximately 57 percent of the common stock of W. T. Grant Co. was held by the public and the remaining 43 percent was held by petitioner, trusts created by him, and the foundation. The shares of common stock of W. T. Grant Co. held by petitioner, the trusts created by him, and the foundation are always voted at the annual stockholders meetings.

The Grant Foundation was incorporated by petitioner as a nonprofit charitable corporation on October 29, 1936. Petitioner was chairman of the board of trustees of the foundation during the years 1956 through 1964. The board of trustees of the foundation consists of nine trustees. Under the bylaws of the foundation not more than two trustees of the foundation may be officers or employees of W. T. Grant Co. and not more than two trustees may be directors of W. T. Grant Co. Section 4 of article 8 of the bylaws of the foundation provides that no common stock of W. T. Grant Co. or of any successor thereof shall be sold or disposed of by the corporation except upon the concurring vote of at least two-thirds of the entire board.

On May 8, 1958, the board of trustees adopted a "Revised Statement on Grant Foundation-Grant Company Relations," which was based on an earlier report dated September 8, 1954. The statement provided in part as follows:

III. FOUNDATION-HELD STOCK

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

2. It is recommended that the Grant Foundation hold intact the W. T. Grant Company common stock it owns unless unusual circumstances or changing conditions make it desirable to do otherwise. It is particularly recommended that the Grant Foundation will not sell Grant Company common stock for the purpose of diversifying the holdings of the Foundation. The objective of this policy is to provide that the sale of Grant stock by the Foundation will not result in placing the control of the Company in the hands of parties who might not be interested in the welfare of the Grant Company and its people.

IV. COMPANY ACTIVITY IN THE FOUNDATION

1. It is recommended that the Foundation Trustees will not elect as Foundation Officers or appoint to the Foundation Staff any active Grant Company officers or employees. The above recommendation does not apply to Mr. Grant. The objective of this policy is to assure that active Grant Company Officers or employees who are Foundation Trustees will not be in a dominant position in the Foundation and to prevent interlocking of the paid employees of the Grant Company and the Grant Foundation.

Petitioner resigned as chairman of the board of trustees of the foundation on December 7, 1965. The foundation does not have and never has had an officer or trustee who was related to petitioner. Since 1956 petitioner has not actively participated in the affairs of the foundation. In 1956 he attended three meetings of the board of trustees of the foundation and in each of the years 1957, 1958, and 1959 he at-

tended only one such meeting, and he has not attended any meetings since May 14, 1959.

During their existence, the foundation and the trustees of any trusts created by petitioner have executed the proxies solicited by the management of the W. T. Grant Co. for the annual meetings of the corporation. During the period from 1937 to 1965, no motions were sought to be included in proxy statements of W. T. Grant Co. by minority stockholders and no nominations for membership to the board of directors of W. T. Grant Co. were made in opposition to the management nominees.

The Connecticut Bank is a bank and trust company with its principal office at Hartford, Conn. It is one of the principal trust companies in the State of Connecticut. Petitioner does not own and never has owned any stock of the Connecticut Bank and is not and never has been an officer or director of that bank.

Each of the trusts created by petitioner to which stock of W. T. Grant Co. was transferred provided that the laws of the State of Connecticut govern all questions pertaining to the validity, construction, and administration of the trust.

In the case of all the trusts created by petitioner of which the Connecticut Bank is cotrustee with an individual, the bank holds the stock certificates for the stock transferred to the trust, keeps the trust records, and collects and disburses the trust income. Discretionary decisions are made by the Connecticut Bank and submitted to the individual cotrustee for his approval. There has never been any difference of opinion between the Connecticut Bank and the individual cotrustee concerning any action recommended by the bank, and there has been very little occasion for the individual cotrustee to perform any administrative functions. All of the trusts created by petitioner of which the Connecticut Bank is a trustee hold stock of W. T. Grant Co.

In 1945 the W. T. Grant Co. issued 150,000 shares of 3¾-percent cumulative preferred stock ($100 par value). The preferred stock was sold to the public through underwriters commencing in August 1945. Approximately 90 percent of the preferred stock is owned by the public and the remaining 10 percent by petitioner, trusts created by him, or the foundation. There are approximately 680 preferred stockholders.

In 1962 the W. T. Grant Co. issued $35 million of 4¾-percent sinking fund debentures due January 1, 1987, and on June 1, 1965, $35 million of 4-percent convertible subordinated debentures due June 1, 1990.

The prospectus with respect to the issue in 1945 of the 3¾-percent cumulative preferred stock contains the following provision with respect to common stock dividend rights:

COMMON STOCK, PAR VALUE $10 PER SHARE

Dividend rights: Subject to the prior rights of the holders of Cumulative Preferred Stock as hereinabove set forth, and the restrictions hereinafter set forth, holders of Common Stock are entitled to such dividends as shall be declared by the Board of Directors out of the assets or funds of the Company legally available therefor.

So long as any of the Cumulative Preferred Stock shall remain outstanding, the Company shall not (1) declare or pay any dividends on any stock ranking junior to the Cumulative Preferred Stock as to dividends or assets nor purchase or redeem any stock ranking junior to the Cumulative Preferred Stock as to dividends or assets, if dividends on the Cumulative Preferred Stock or any sinking fund or stock purchase fund payment with respect to any series of Cumulative Preferred Stock shall be in arrears, nor (2) declare or pay any dividend (other than a stock dividend payable in stock of a class ranking junior to the Cumulative Preferred Stock as to dividends and assets) on any stock ranking junior to the Cumulative Preferred Stock as to dividends or assets, nor purchase or redeem any stock ranking junior to the Cumulative Preferred Stock as to dividends or assets, if the aggregate amount expended after January 31, 1945 for dividends on or before the purchase or redemption of shares of any class of stock ranking junior to the Cumulative Preferred Stock as to dividends or assets exceeds an amount equal to the aggregate of (a) the consolidated net earnings of the Company and its subsidiaries earned after January 31, 1945, as determined in accordance with generally accepted accounting practice, (b) $5,000,000, and (c) the net proceeds from the sale after January 31, 1945 of any shares of any class of stock ranking junior to the Cumulative Perferred Stock as to dividends and assets.

The prospectus issued January 24, 1962, with respect to the 4¾-percent sinking fund debentures due January 1, 1987, contains the following provision with respect to dividends:

RESTRICTIONS AS TO DIVIDENDS AND CERTAIN OTHER PAYMENTS

The Indenture will prohibit the payment of dividends on stock of the Company (other than its 3¾ percent Cumulative Preferred Stock), except dividends payable in stock of the Company, or the purchase, redemption or other acquisition or retirement for value of any such stock (other than Common Stock to be held for the Company's Deferred Contingent Compensation Plan) by the Company or the purchase or other acquisition for value of any such stock by a Restricted Subsidiary if, upon giving effect thereto, the aggregate amount (including dividends paid on the 3¾ percent Cumulative Preferred Stock of the Company) expended for such purposes subsequent to January 31, 1965 shall exceed an amount equal to the sum of (a) Consolidated Net Income (as defined) of the Company and its Restricted Subsidiaries earned subsequent to January 31, 1965, (b) the net proceeds of the sale of stock of the Company after January 31, 1965 (other than Common Stock held for the Company's Deferred Contingent Compensation Plan), (c) the net proceeds of the sale after January 31, 1965 of any indebtedness of the Company (including the Debentures) which has been converted into stock of the Company, and (d) $20,000,000. The Indenture does not restrict (i) the payment of any dividend within 60 days after the date of declaration thereof, if at said date the declaration complied with the provisions of the Indenture, or (ii) the retirement of stock of any class in exchange for, or out of the proceeds of the substantially concurrent sale of, other shares of the

Company's stock or the retirement of stock (other than Common Stock) by exchange for, or out of the proceeds of the substantially concurrent sale of, Funded Indebtedness (as defined) ; no effect is to be given to such transactions in any calculations made in accordance with the preceding sentence. (Sections 6.04 and 1.01)

The prospectus issued June 23, 1965, with respect to the sale of the 4-percent convertible subordinated debentures due June 1, 1990, contains the following provisions with respect to dividends:

### RESTRICTIONS AS TO DIVIDENDS AND CERTAIN OTHER PAYMENTS

The Company is not to (a) pay any dividend (other than those payable on the 3¾ percent Cumulative Preferred Stock of the Company or payable in shares of its stock), or (b) make or permit any Restricted Subsidiary to make any payment for the purchase, redemption or retirement of its stock (other than Common Stock to be held for the Company's Deferred Contingent Compensation Plan or stock retired by exchange for, or out of the proceeds of the substantially concurrent sale of, other stock or subordinated indebtedness of the Company), or (c) make, or permit any Restricted Subsidiary to make, any investment in or advance to any Non-restricted Subsidiary after January 31, 1961 which will cause the then outstanding aggregate amount thereof to exceed $10,000,000, if, upon giving effect thereto, the sum of the aggregate amount expended as in (a) and (b) above (plus Preferred Stock dividend payments) and such investments and advances in excess of $10,000,000 in the aggregate then outstanding as in (c) above, exceeds Consolidated Net Income (as defined) of the Company and its Restricted Subsidiaries for the period subsequent to January 31, 1961 plus (i) $15,000,000, and (ii) the aggregate consideration received by the Company after that date with respect to the issue or sale of any of its capital stock (other than Common Stock held for the Company's Deferred Contingent Compensation Plan). (Section 4.07)

On January 31, 1959, the total earnings of W. T. Grant Co. retained in the business amounted to approximately $82 million. On January 31, 1965, the total funds of W. T. Grant Co. retained in the business amounted to approximately $111 million.

The New York Stock Exchange company manuals in effect for the period August 15, 1955, through June 15, 1966, contain a statement that many companies find it preferable at times to pay dividends in stock rather than in cash and in order to guard against possible misconception by the shareowners of the effect of stock dividends on their equity and on their relation to current earnings, the exchange had adopted certain standards of disclosure and accounting treatment which was stated in part to be as follows:

### EXCHANGE LISTING POLICY

The Exchange, in authorizing the listing of additional shares to be distributed pursuant to a stock dividend (or a stock split-up, whether or not effected through the technique of a stock dividend) representing less than 25 percent of the number of shares outstanding prior to such distribution will require that, in respect

of each such additional share so distributed, there be transferred from earned surplus to the permanent capitalization of the company (represented by the capital stock and capital surplus account) an amount equal to the fair value of such shares. While it is impracticable to define "fair value" exactly, it should closely approximate the current share market price adjusted to reflect issuance of the additional shares.

Applicability of Exchange Policy: This policy does not apply to distributions representing 100 percent or more of the number of shares outstanding prior to the distribution. As to distributions of 25 percent or more, but less than 100 percent, the Exchange will require capitalization at fair value only when, in the opinion of the Exchange, such distributions assume the character of stock dividends through repetition under circumstances not consistent with the true intent and purpose of stock split-ups.

Reference is made to Section A 14 of this Manual, entitled *Stock Split-Ups*, for a statement of the Exchange's policy in relation to split-ups.

Notice to Stockholders with Distribution: A notice should be sent to stockholders with the distribution advising them of the amount capitalized per share, the aggregate amount thereof, the relation of such aggregate amount to current undistributed earnings, the account or accounts to which such aggregate has been charged and credited, the reason for paying the stock dividend and that sale of the dividend shares would reduce their proportionate equity in the company.

On his gift tax return for each of the calendar years 1956, 1957, 1958, and 1960 through 1964, petitioner reported as gifts the fair market value of the common stock of W. T. Grant Co. transferred by him in trust as of the date of the transfer, such fair market value being computed by taking the average of the high and low prices at which the stock was sold in transactions on the New York Stock Exchange on the respective dates.

From the value of gifts as so reported petitioner deducted the values on the respective dates of the transfers of the remainder interest to the foundation in such gifts by use of the tables for calculating trust remainder interests contained in the Gift Tax Regulations, the calculation being made on the basis of the fair market value of the stock transferred to the trusts computed as stated heretofore.

Except for minor adjustments not here in issue the deficiencies determined by respondent resulted from the method used by respondent in calculating the amounts of the deductions for the value of the gifts by petitioner to the foundation as remainderman of the various transfers in trust made by petitioner. Respondent calculated such deductions in accordance with the tables in the Gift Tax Regulations for valuing trust remainder interests, but for the purpose of this calculation he took as the value per share of common stock of the W. T. Grant Co. on the various dates of the transfers the fair market value per share of such stock on the valuation date as reported by petitioner minus the per-share amount of accumulated earnings and profits on or about

620

the valuation date divided by the number of shares of common stock outstanding on that date.[2]

At the trial the parties stipulated the amount of charitable deduction allowable for the trust created by petitioner under the trust agreement dated June 22, 1961, and the amounts of the charitable deductions allowable for transfers to existing trusts made by petitioner by instruments dated January 3, 1963, and January 2, 1964.

### OPINION

Section 2522(a) provides that in computing taxable gifts for the calendar year, there shall be allowed as a deduction in the case of a citizen or resident, the amounts of all gifts made during such year to or for the use of a corporation or foundation organized and operated exclusively for religious, charitable, scientific, literary, or educational purposes. Section 25.2522(a)-2(a), Gift Tax Regs.,[3] provides

---

[2] In a letter from the director, Tax Rulings Division, to petitioner's attorney, dated Sept. 17, 1964, the following explanation of this adjustment was given with respect to three of the trusts, gifts to which are here in issue :

In any event, our study clearly indicates that, under the trust agreements being considered, the distribution of stock dividends of five percent or less as income is not limited to a single stock dividend during any calendar year. Additionally, we find nothing which would prohibit the W. T. Grant Company from initiating a policy of paying small stock dividends semiannually, or even quarterly, in which event stock dividends to noncharitable income beneficiaries could aggregate five, ten, or even twenty percent per annum. The fact that the W. T. Grant Company has never paid stock dividends in the past is not significant in view of current business trends. However, we have reached the conclusion that the operation of article SIXTH 2 of the trust agreements cannot result in dilution of the interest of the charitable remaindermen below a value based on the per share fair market value of the common stock, on the date of transfer, less the per share amount of the accumulated earnings and profits of the corporation at that time. Accordingly, it is held that deduction, under section 2522(a) of the 1954 Code, may be allowed in this case to the extent of the value of the charitable remainder interests computed by applying the actuarial factors shown below to the fair market value of each share transferred as of the date of transfer ($51.8125) less the per share amount of accumulated earnings and profits as of that date (approximately $29.8125) or approximately $22.00. * * *

The present worth of $1.00 due at the death of the survivor of two persons aged 49 and 23 years is $0.21195. * * *

Assuming that the fair market value per share, less accumulated earnings and profits attributable thereto on the date of transfer, is correctly valued at $22.00, the amount to be allowed as a charitable deduction in this case may be computed as follows :

MARIAN GRANT HENRY TRUST

$22.00  ×  6,000  ×  0.21195_____ $27,977.40

The deleted portions of the letter contained similar computations for the other two trusts.

[3] Sec. 25.2522(a)-2.  Transfers not exclusively for charitable, etc., purposes.

(a) Remainders and similar interests. If a trust is created or property is transferred for both a charitable and a private purpose, deduction may be taken of the value of the charitable beneficial interest only insofar as that interest is presently ascertainable, and hence severable from the noncharitable interest. The present value of a remainder or other deferred payment to be made for a charitable purpose is to be determined in accordance with the rules stated in Sec. 25.2512-5. * * *

(b) Transfers subject to a condition or a power. If, as of the date of the gift, a transfer for charitable purposes is dependent upon the performance of some act or the happening of a precedent event in order that it might become effective, no deduction is allowable unless the possibility that the charitable transfer will not become effective is so remote as to be

that if a trust is created or property is transferred for both a charitable and private purpose, deduction may be taken of the value of the charitable beneficial interest only insofar as that interest is presently ascertainable and severable from the noncharitable interest.

The present value of a remainder interest or other deferred payment is to be determined in accordance with the rules stated in section 25.2512–5, Gift Tax Regs. Section 25.2512–5(a) provides that the fair market value of life estates, remainders, and reversions is their present value, determined in accordance with the provisions of that section. The section lists tables for use in determining the present value of a life estate for one individual or two or more individuals in order that the value of the life estate and reversion may be computed. These regulations (sec. 25.2512–5(d)) provide that if the interest to be valued is a remainder interest subject to a life estate, the value of the interest should be obtained by multiplying the value of the property at the date of the gift by the appropriate figure contained in the tables set forth therein.

Therefore, under these regulations, if the remainder interest in the trusts to which petitioner transferred the W. T. Grant Co. stock passed absolutely to the foundation without a more than negligible possibility that the charitable transfer would not become effective, the petitioner's method of valuation is in accordance with the regulations. Under the provisions of section 25.2522(a)–2(b), Gift Tax Regs., set forth in footnote 3, if the transfer for charitable purposes is dependent on some happening of a precedent event in order that it might become effective, no deduction is allowable unless the possibility that the charitable transfer will not become effective is so remote as to be negligible and the deduction is not allowable to the extent that the donee or trustee is empowered to divert the property or fund to a use which would have caused the deduction not to be allowable if such use had been the use for which the fund was given.

In the instant case respondent does not precisely state under what portion of these regulations he takes the position that the fair market value of the stock as of the date of the gift should be reduced by the per-share amount of accumulated earnings as of that date to determine the value to which to apply the figures contained in the actuarial tables in determining the amount of the charitable deductions. He argues that there existed at the date of such transfer of stock to the various trusts the possibility that stock dividends of less than 5 percent

negligible. If an estate or interest passes to or is vested in charity on the date of the gift and the estate or interest would be defeated by the performance of some act or the happening of some event, the occurrence of which appeared to have been highly improbable on the date of the gift, the deduction is allowable. If the donee or trustee is empowered to divert the property or fund, in whole or in part, to a use or purpose which would have rendered it, to the extent that it is subject to such power, not deductible had it been directly so given by the donor, deduction will be limited to that portion of the property or fund which is exempt from the exercise of the power. * * *

of the oustanding stock would be declared by W. T. Grant Co. in such quantities that all the accumulated earnings of the company as of the date of the transfer of the stock would be absorbed by such dividends and that this possibility is not so remote as to be negligible. He also argues that because of the provisions in the various trusts with respect to the stock dividends of less than 5 percent going to the income beneficiary, the beneficial interest in the stock transferred to the charity is not presently ascertainable except to the extent of the value as he has determined it. In addition, he argues that the control by the donor over the W. T. Grant Co. was such that the donor in effect retained the power to dilute the charitable gift by having W. T. Grant Co. declare a series of stock dividends in an amount of 5 percent or less until all of the accumulated earnings of W. T. Grant Co. which existed at the dates of the various transfers of stock to the trusts would have been diverted to the life beneficiaries by the setover to capital in accordance with the provisions of the New York Stock Exchange and Delaware law, which capital would go to the life beneficiaries prior to the time of the receipt by the charity of the trust corpus.

The reason that respondent gives for not disallowing the charitable deduction for the transfer to the foundation in its entirety is that the requirement of the New York Stock Exchange that accumulated earnings of a corporation be set aside when stock dividends of 25 percent or less of the value of the outstanding stock are declared would prohibit any invasion of the trust corpus in excess of that portion represented by accumulated earnings of the W. T. Grant Co. at the respective dates of transfers of stock to the trusts. Respondent points out that the law of Delaware under which W. T. Grant Co. is incorporated prohibits the declaration of dividends, including stock dividends, as distinguished from stock splits or exchanges, except to the extent of the accumulated earnings of the company issuing such stock dividends. 4 Del. Code Ann. tit. 8, sec. 170.[4]

---

[4] Sec. 170.  Dividends; payment; wasting asset corporations.

(a) The directors of every corporation created under this chapter, subject to any restrictions contained in its certificate of incorporation, may declare and pay dividends upon the shares of its capital stock either (1) out of its net assets in excess of its capital as computed in accordance with the provisions of sections 154 and 242–244 of this title, or (2) in case there shall be no such excess, out of its net profits for the fiscal year then current and/or the preceding fiscal year. If the capital of the corporation computed as aforesaid shall have been diminished by depreciation in the value of its property, or by losses, or otherwise, to an amount less than the aggregate amount of the capital represented by the issued and outstanding stock of all classes having a preference upon the distribution of assets, the directors of such corporation shall not declare and pay out of such net profits any dividends upon any shares of any classes of its capital stock until the deficiency in the amount of capital represented by the issued and outstanding stock of all classes having a preference upon the distribution of assets shall have been repaired.

(b) Subject to any restrictions contained in its certificate of incorporation, the directors of any corporation engaged in the exploitation of wasting assets may determine the net profits derived from the exploitation of such wasting assets without taking into consideration the depletion of such assets resulting from lapse of time or from necessary consumption of such assets incidental to their exploitation.

Petitioner and respondent both discuss various laws dealing with the allocation of stock dividends between income and corpus of a trust when the trust provides for a life beneficiary and remainderman, in the absence of a provision in the trust instrument with respect to such allocation. Both parties agree, and the case law is clear, that where there is a provision as to the allocation, as here, the allocation is to be in accordance with the provision of the trust instrument, and allocation rules absent such a provision are of relevance only insofar as they indicate the underlying problem occasioned by the declaration of stock dividends with respect to stock which is held in a trust which has a life beneficiary and a remainderman.

The parties are agreed that under the Massachusetts rule, a stock dividend issued in stock of the declaring corporation goes to capital of the trust fund, but cash dividends are always income for the trust. *Hyde* v. *Holmes*, 198 Mass. 287, 84 N.E. 318 (1908). The parties are likewise agreed that under the Pennsylvania rule, stock dividends go to the income beneficiary except to the extent that it is necessary to allocate a portion thereof to the principal of the trust to keep the shares of sock transferred to the trust at the book value which they had at the time they were transferred to the trust, or stated another way, this rule holds that a life beneficiary is entitled to the net income of the corporation accrued after the stock is acquired by the trust whether paid by stock or cash dividends, except to the extent that the stock which forms a part of the principal of the trust would, by the dividend declared, be reduced below its book value as of the date the stock was transferred to the trust. See the discussion of this rule and its development in *Cunningham's Estate*, 395 Pa. 1, 149 A. 2d 72 (1959).

The Massachusetts common law rule has been adopted in the Uniform Principal and Income Act which has been adopted by a number of States including Connecticut which adopted this Act in 1939. It has been recognized that the Massachusetts rule as now adopted by the Uniform Principal and Income Act is unfair in some instances to the life beneficiary. However, this rule has the advantage of simplicity, whereas the Pennsylvania rule is difficult of application. See *Gibbons* v. *Mahon*, 136 U.S. 549, 564–567 (1890), and Bogert, Trusts & Trustees, sec. 845 (2d ed.).

Some States have in recent years modified by statute the rule of the Uniform Principal and Income Act by adopting specific legislation which provides that small stock dividends, usually limited to 4 to 6 percent of the value of the stock with respect to which they are issued, shall be considered as income of a trust and all other stock dividends as principal. In explaining the problem created by issuance of stock dividends, Bogert, Trusts & Trustees, sec. 845, p. 480 (2d ed.), states:

The problem is, What disposition must be made of the new stock after the stock dividend in order that justice may be done to the two parties interested under

the trust, the income and remaindermen beneficiaries. If one assumes that a trustee was given one share of stock having a par value of $100 in a corporation which then had a capitalization of $10,000 and a surplus of $5,000, he held the stock for ten years during which time the corporation accumulated additional surplus to the amount of $20,000, and then it declared a stock dividend of 100%, the trustee who originally held one share with a book value of $150 would then hold two shares with a combined book value of $350 (200 shares having an interest in corporate capital and surplus totalling $35,000 would make the book value of one share $175). If the one new share received is added to trust capital, the book value of that account will increase from $150 to $350, as far as the interest in this stock is concerned, but the income beneficiary will have lost all chance to receive a cash dividend out of the $10,000 of accumulated profits which were transferred from the surplus to the capital account; and if the one new share is awarded by the trustee to the income account it will receive a benefit worth $175 and the trust capital account will retain the one old share now having a book value of $175 instead of its original book value of $150.[40.5] [Footnote omitted.]

Petitioner points out, and it is apparent, that a corporation may declare cash dividends in an amount sufficient to absorb not only earnings and profits accumulated after the creation of a trust but the accumulated earnings and profits which existed at the time the trust was created, and under the Delaware statute which is quoted in footnote 4, this would be legal. Therefore, there is a possibility that the earned surplus existing when the stock is transferred to the trust, which forms a part of the book value of the stock and reasonably might be assumed at least to affect the fair market value of the stock, will be reduced or entirely absorbed by payment of cash dividends which would be trust income to which the income beneficiary of the trust is entitled.

Respondent argues that this is not a fair comparison since a stock dividend by its nature, if not retained by the owner of the shares with respect to which it is declared, causes a change in the respective ownership by stockholders in the corporation, whereas a cash dividend does not. Respondent cites *Eisner* v. *Macomber*, 252 U.S. 189, 211–212 (1920), with particular reference to the statement therein at page 212 that:

But if a shareholder sells dividend stock he necessarily disposes of a part of his capital interest, just as if he should sell a part of his old stock, either before or after the dividend. What he retains no longer entitles him to the same proportion of future dividends as before the sale. His part in the control of the company likewise is diminished. * * *

The question in *Eisner* v. *Macomber*, *supra*, was the constitutionality of a statute providing that stock dividends were includable in the income of a taxpayer subject to income tax. The issue in the present case is not whether stock dividends are income but whether permitting stock dividends of 5 percent or less of the value of the stock of a corporation to go to the life beneficiary of a trust causes there to exist a possibility which is more than negligible that the transfer to the charitable

remainderman will not become effective, or that because of this provision the donee or trustee is empowered to divert the property or fund to a noncharitable use. In considering the question in this case it must be approached from the standpoint not of what are properly increases in capital of the corporation but whether provision for considering small stock dividends as income would cause a diversion of the corpus of the trust to noncharitable uses. The corporation may accumulate earnings after the creation of the trust and these earnings do not belong to the shareholders as distinguished from the corporation in which they hold stock unless or until dividends are declared. As stated in *Gibbons* v. *Mahon, supra* (p. 558) :

> Money earned by a corporation remains the property of the corporation, and does not become the property of the stockholders, unless and until it is distributed among them by the corporation. The corporation may treat it and deal with it either as profits of its business, or as an addition to its capital. Acting in good faith and for the best interests of all concerned, the corporation may distribute its earnings at once to the stockholders as income; or it may reserve part of the earnings of a prosperous year to make up for a possible lack of profits in future years; or it may retain portions of its earnings and allow them to accumulate, and then invest them in its own works and plant, so as to secure and increase the permanent value of its property.
>
> Which of these courses shall be pursued is to be determined by the directors, with due regard to the condition of the company's property and affairs as a whole; and, unless in case of fraud or bad faith on their part, their discretion in this respect cannot be controlled by the courts, * * *

It, therefore, is apparent that whenever stock is transferred to a trust which has a life income beneficiary and a remainderman, the action of the corporate directors in accumulating income or distributing it will have a pronounced effect on whether the trust corpus increases or decreases in value. The accumulated earnings of the corporation may be eliminated by losses sustained by the corporation after the date of the transfer of the stock to the trust. When stock in a corporation is transferred to a trust and is held for a number of years until the death of a life beneficiary, that stock is unlikely to have the actual dollar value at the date the remainderman receives it that it had at the date of its transfer. If the corporation is successful and its earnings are high and it does not distribute its total earnings in dividends, the stock will have a higher book value and is very likely to have a higher fair market value when it is received by the remainderman than when it was transferred to the trust. If the corporation sustains losses, thereby absorbing any earned surplus which it had as of the time of the stock was transferred to the trust, and perhaps causing a deficit, the stock will have a lower book value and may well have a lower fair market value when the remainderman receives it than it had when it was transferred to the trust even though the life beneficiary will have received less income than in the instance of a successful corporation.

However, the regulations provide for valuing stock at its fair market value on the date of transfer for the purpose of determining the gift tax and provide tables to be used for determining the value of the remainder interest.

Considering the nature of stock it might be argued that when the gift of stock is made to a trust, the income of which is to be paid to a noncharitable beneficiary for that individual's life with the remainder to go to a charitable beneficiary, the remainder interest is not ascertainable with reasonable certainty if it is assumed that the trust will hold the stock transferred to it. Not only does the dividend policy of the corporation and its earnings ability in the years subsequent to the transfer affect the value of the stock, but such value may also be affected by the nature of the assets in which its capital or any earnings it has accumulated are invested, and whether these assets appreciate or depreciate in value. Likewise, whether stock dividends are all considered part of the corpus of the trust or some part of them are considered as income will affect this value. There is no difference in the situation where small stock dividends are to be treated as income to go to the life beneficiary under the provisions of the trust instrument and where they are to be so treated by State law insofar as the effect on the value of the remainderman's interest in the trust is concerned.

New York is one of the States which recently provided by statute (N.Y. Pers. Prop. Law sec. 27-e(2)) that stock dividends of 6 percent or less made to a trustee shall be income. If no provision is made in a trust governed by this law of New York as to the treatment of stock dividends paid to a trustee, the income of which is to be paid to an individual for life and the remainder to a charity, the treatment of such dividends under New York law would be substantially the same as the treatment under the trust instruments here involved.

While respondent places great reliance on the law of Connecticut providing that all stock dividends are capital, he does not suggest what the difference would be if this were a New York trust created after the enactment of the statute heretofore referred to from the situation here where the provision as to small stock dividends being income is in the trust instrument.

All of the argument made by respondent is based on the rights of a stockholder and proceeds under the philosophy that when a share of stock is issued to such stockholder as a stock dividend and accumulated earnings of the corporation are capitalized, the stockholder has no more after the issuance of the dividend than prior thereto. Prior to the issuance of the dividend, the stockholder owned the same proportionate interest in the corporation which had the same assets in capital and surplus that it has after the stock dividend is declared with a larger percentage of such assets designated on its books as capital.

This argument overlooks the fact that where stock is transferred to a trust, the trustee and not the remainderman of the trust or the life beneficiary of the trust is the stockholder. The remainderman does not have all rights of a stockholder. One of the substantial rights which he does not have, even if the trust were required to retain the stock, is the right to participate in distributions of income by the corporation so long as the life beneficiary lives. It is because of the bundle of rights comprising a stockholder's interest being equitably divided between a life beneficiary and a remainderman that the problem of what is capital and what is income is created. Where stock is held by a corporation in its treasury, it is an asset owned by the corporation which forms a part of the corporate assets in which each stockholder has an equitable interest just as does any other asset. If such treasury stock is distributed as a dividend and a stockholder receiving such a dividend disposes of it by sale, his proportionate right to share in future corporate dividends and in the corporate management is diluted as much as it is by the sale of stock declared as a stock dividend. However, the Connecticut courts consider a distribution of treasury stock as a dividend which is income to be paid over to the life beneficiary of the trust. *Greene* v. *Bissell*, 79 Conn. 547, 65 Atl. 1056 (1907).

Viewed in the light of the remainderman having only a future interest in the trust corpus and the specific number of shares of stock transferred as constituting that corpus, the corpus of the trust is not impaired as long as the trustee holds that number of shares, shares received in exchange for such shares, or as a split of such shares, or the money received upon the sale of those shares or the other assets purchased with the money received upon the sale of those shares. It is not necessary that any increments that might be viewed as the fruit of the original shares transferred to the trust as distinguished from replacement of corpus be considered as a part of the principal of the trust to go to the remainderman to reach the conclusion that the remainder interest can be computed with reasonable certainty and is not subject to divestment or to be partially diverted by either the trustees or the donor.

We conclude that the provision in the trust instruments here involved with respect to stock dividends of 5 percent or less being trust income does not cause any more uncertainty as to the value of the charitable remainders of the various trusts than exists in any situation in which the transfer to such a trust is of stock.

Respondent argues that because of the control that petitioner had over the W. T. Grant Co., he had the power to divert the trust principal from the remainderman to the life beneficiary. Many of the cases cited by the parties with respect to invasion of corpus of a trust involve estate tax questions, but the regulations with respect to charitable gifts

are substantially the same as those involving charitable bequests so that the principles announced in cases involving estate tax would be applicable in a gift tax case. See *Estate of Simon Guggenheim*, 1 T.C. 845 (1943).

Respondent cites and relies on such cases as *Commissioner* v. *Sternberger's Estate*, 348 U.S. 187 (1955), which involved a charitable bequest which would take effect only if the decedent's daughter who was 27 years old at the time of decedent's death died without descendants surviving her, and *Henslee* v. *Union Planters Bank*, 335 U.S. 595 (1949), which involved the power of invasion of the trust principal for the benefit of the life beneficiary which invasion was held not to be limited to an ascertainable standard.

The present case does not fit the pattern of these cases or any of the other cases cited by either party. Even if the donor and the trustees in combination with the foundation might possibly be considered as able to control the issuance of stock dividends by W. T. Grant Co., which is extremely doubtful, the fact remains that the foundation is the remainderman of the trusts with an interest adverse to the life beneficiary. Even in cases involving discretion over the trust corpus by trustees who are also the life beneficiaries of the trusts, the remainder interests of which are given to charity, we have held that the gift to charity is ascertainable in the absence of any showing that the trustees will violate their trust for their own benefit as income beneficiaries. *William D. O'Brien*, 46 T.C. 583, 595 (1966).

In the instant case, in order for the corpus of the trust to be diverted, it would have to be assumed that the management of W. T. Grant Co. would declare stock dividends in small amounts on so regular a basis as to absorb not only earnings accumulated after the creation of the trusts here involved but also the accumulated earnings existing at the time the trusts were created, and that the trustees of the trusts would cooperate in such an erosion of trust corpus by holding the W. T. Grant Co. stock after such a policy was adopted by the directors of that company. In either case the assumption would be that fiduciaries would be unfaithful to the trust placed in them. There is no evidence, whatsover, in this case to support such a conclusion. The evidence is to the contrary.

It is to be noted here that in order to sell the W. T. Grant Co. stock, the trustees would have to obtain the consent of two-thirds of the directors of the foundation, the remainderman of the trusts.

On the facts of this case we conclude that any possibility that the charitable transfer will not become effective is so remote as to be negligible. In reaching this conclusion we have considered the admonishment of the Court in *Henslee* v. *Union Planters Bank, supra* at 599, that "What common experience might regard as remote in the

generality of cases may nonetheless be beyond the realm of precise prediction in the single instance." We have also considered whether the uncertainty here is "appreciably greater than the general uncertainty that attends human affairs." *Ithaca Trust Co.* v. *United States*, 279 U.S. 151 (1929). As we have pointed out, there is no more likelihood that the accumulated earnings of the W. T. Grant Co. at the date the stock was transferred to the trusts would be diverted to the life beneficiaries than there is in any case where stock is transferred to an otherwise similar trust which contains no specific provisions as to what constitutes income.

We have recited a number of facts, mostly stipulated, pertaining to a few years after the last year here in issue, but in doing so have not considered them with respect to "what actually happened" (see *Ithaca Trust Co.* v. *United States, supra*), but only as they might bear on "the estimate of probable events" as they existed at the date of each transfer to the trusts here involved. *Lincoln Rochester Trust Co.* v. *McGowan*, 217 F. 2d 287, 293 (C.A. 2, 1954).

In view of our conclusion, it is unnecessary to consider respondent's contention that gifts for the years 1956 through 1958 may be recomputed in computing the gift tax for later years or petitioner's contention that the provisions of the trusts created in 1963 and 1964 differ sufficiently from the earlier ones as to require in any event the full allowance of the charitable deduction for gifts to those trusts.

We hold that petitioner's method of computing the charitable deductions for the years here involved is proper, but because of certain stipulated adjustments,

*Decision will be entered under Rule 50.*

